[Cite as *Eastley v. Volkman*, 2010-Ohio-4771.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| PAULA EASTLEY, Administrator of the Estate of Steven Hieneman, | : | Case Nos. 09CA3308 |
| | : | 09CA3309 |
| Plaintiff-Appellee, | : | |
| | : | |
| v. | : | DECISION AND JUDGMENT ENTRY |
| | : | |
| PAUL HOLLAND VOLKMAN, M.D.,[1] | : | |
| | : | |
| Defendant, | : | |
| | : | **Released 9/23/10** |
| | : | |
| DENISE HUFFMAN, d/b/a Tri-State Health Care, | : | |
| | : | |
| Defendant-Appellant, | : | |
| | : | |
| and | : | |
| | : | |
| STATE FARM FIRE AND CASUALTY COMPANY, | : | |
| | : | |
| Intervenor. | : | |

_____
APPEARANCES:

Mark H. Gams and M. Jason Founds, GALLAGHER, GAMS, PRYOR, TALLAN & LITTRELL, L.L.P., Columbus, Ohio and James L. Mann, MANN & PRESTON, L.L.P., Chillicothe, Ohio, for Appellant Denise Huffman, d/b/a Tri-State Health Care.

Thomas M. Spetnagel, SPETNAGEL & McMAHON, Chillicothe, Ohio, and Stanley C. Bender, Portsmouth, Ohio, for Appellee Paula Eastley, Administrator of the Estate of Steven Hieneman.

John F. McLaughlin, RENDIGS, FRY, KIELY & DENNIS, L.L.P., Cincinnati, Ohio, for Intervenor State Farm Fire and Casualty Company.

_____
Harsha, J.

**{¶1}** The estate of Steven Hieneman sued Denise Huffman, owner of the Tri-

_____
[1] Volkman has not entered an appearance or otherwise participated in this appeal.

State Healthcare pain management clinic, and Paul Volkman, M.D., a physician at the clinic, for Hieneman's wrongful death. While a patient at the clinic, Hieneman received treatment from Volkman, who gave him prescriptions for oxycodone, xanax, and valium. The next day, Hieneman died due to the acute combined effects of these drugs. A jury found that Volkman's medical malpractice and Huffman's ordinary negligence proximately resulted in Hieneman's death.

{¶2}   Huffman contends that the jury's verdict finding her negligent was against the manifest weight of the evidence and must be reversed. Although a majority of this panel agrees with Huffman's contention, a judgment resulting from a trial by jury cannot be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause. Because one judge on the panel dissents from the majority's determination, the verdict against Huffman survives the manifest weight of the evidence challenge.

{¶3}   Huffman also argues that the trial court erred when it refused to instruct the jury on the doctrine of comparative negligence. However, she failed to offer any evidence that would allow reasonable minds to conclude that Hieneman negligently contributed to his own death. Therefore, the court properly refused to instruct the jury on this doctrine.

{¶4}   Next, Huffman claims that the trial court erred when it denied her motion for judgment on the pleadings based on the estate's failure to attach an affidavit of merit to its complaint or amended complaint. But because the estate did not allege that Huffman qualified as one of the enumerated medical providers in R.C. 2305.113(E)(3), its ordinary negligence claim against her does not qualify as a "medical claim" under

that section.   Thus, an affidavit was not necessary for that claim.

{¶5}    Based on her Fifth Amendment privilege against compulsory self-incrimination, Huffman also contends that the trial court abused its discretion when it denied her motion to stay the civil matter pending the resolution of criminal proceedings against her.  However, this privilege does not prohibit civil litigation while the possibility of criminal prosecution exists; the fact that a civil defendant may lose a suit if she chooses to exercise the privilege does not raise a claim of compulsion by the state. Thus, the court's decision to deny the motion was not unreasonable, arbitrary, or unconscionable.

{¶6}    Intervening defendant State Farm Fire and Casualty Company ("State Farm") contends that the trial court erred in denying its motion for summary judgment and granting the estate's motion for summary judgment in State Farm's declaratory judgment action against Huffman.  The trial court found that Huffman's negligence fell within the liability coverage of the business insurance policy State Farm issued her. However, all the facts indicate that Hieneman's death was caused at least in part by Volkman's rendering of medical services and that Huffman was engaged in the business of providing those services to Hieneman.  Thus as a matter of law, the unambiguous language of the policy's professional services exclusion bars coverage. Accordingly, the court erred when it granted the estate's motion for summary judgment and when it denied State Farm's motion.

## I.  Facts

{¶7}    The estate filed a complaint for Hieneman's wrongful death, alleging that Volkman committed medical malpractice and that Huffman "breached a duty she owed

to [Hieneman] not to negligently cause him harm[,]" proximately resulting in his death. The estate also alleged that Huffman and Volkman were "vicariously responsible for each other's conduct." State Farm intervened as a third-party defendant because it had issued a business insurance policy, which was in effect on the date of Hieneman's death, to Denise Huffman, dba Tri-State Healthcare. It filed a complaint for declaratory judgment, asking the court to declare that State Farm had no obligation to defend or indemnify Volkman or Huffman against the estate's claims. The trial court bifurcated the declaratory judgment claim from the underlying wrongful death action. A summary of the evidence introduced at the wrongful death trial follows.

{¶8} Russell Steven, M.D., a pain medicine specialist, testified that on February 22, 2005, Volkman wrote Hieneman a prescription for 360, five milligram percocet tablets, instructing him to take 12 pills daily. If taken as prescribed, Hieneman would have been out of this medication for almost one month before his next appointment with Volkman on April 19, 2005. At the follow-up visit, Volkman wrote Hieneman prescriptions for: 1) Oxycodone – 360, 15 milligram tablets; 2) Valium – 120, 10 milligram tablets; 3) Xanax – 30, 2 milligram tablets. An autopsy report showed that Hieneman died the next day, i.e, April 20, 2005, from the acute combined effects of the latter three drugs.

{¶9} On cross-examination, Dr. Steven admitted that the autopsy did not reveal what amount of the prescription medications Hieneman took between the time the prescriptions were filled and his death. However, Dr. Steven testified that even if Hieneman took the medications as Volkman prescribed, they could have caused his death because the drugs are synergistic, i.e. when taken together the efficacy of each

drug is enhanced, and Hieneman's opioid receptors would have reset during the nearly one month he was out of percocet, i.e. his tolerance level for opioid pain medications would have decreased. Dr. Steven testified that Volkman fell below the standard of care in writing these prescriptions.

{¶10} Paula Eastley, Hieneman's mother and administrator of his estate, testified that her son took pain medication after injuring his hand. At some point, Eastley learned that Hieneman received treatment at Tri-State Healthcare. In August 2004, Eastley felt her son was overmedicated and tried to speak with Volkman, but he refused. When Eastley called Huffman and asked her to tell Volkman that she no longer wanted him to treat her son, Huffman hung up on her. Eastley contacted Huffman again and told her that Hieneman was bipolar and "having a lot of problems." Eastley informed Huffman that Hieneman was under the care of another pain clinic, seeing a psychiatrist, and in physical therapy. Huffman told Eastley that her son "was a growing man and he could make his own decisions and it was really none of [her] business." The medical records in evidence do not show that Hieneman received treatment at the clinic during the time period Eastley contacted Huffman and Volkman. The records do show Volkman prescribed him medication in February 2004 but did not see him again until February 2005.[2]

{¶11} Huffman testified via deposition that she had a GED and little formal education in the medical field. In 2001 she started Tri-State Healthcare and primarily staffed the clinic with doctors from placement agencies. However, Volkman

---

[2] Both parties attribute this treatment gap to Hieneman's failure to appear for a "pill count," which is a procedure used to ensure a patient is taking medication as directed. However, the trial record does not support this conclusion. Hieneman's medical records provide no explanation for the gap. Although Huffman referred to the pill count in her deposition, that portion of her deposition was not read to the jury. The only mention of the pill count at trial was made during opening statements, which are not evidence.

independently contacted her about practicing at the clinic and came to Tri-State Healthcare in April 2003. Huffman testified that she paid bills, assisted in taking the blood pressure of patients, did some medical charting, and maintained patient records at the clinic. But, she denied any involvement in Hieneman's treatment and contended that she did not monitor Volkman's work in any manner. Huffman admitted that she had looked at Hieneman's charts before. These records contained information indicating that Hieneman may have abused pain medications in the past. But when asked whether she knew if Hieneman was addicted to drugs prior to his death, Huffman testified "I don't know. I'm not aware of it if he was."

{¶12} The jury found in favor of the estate against both Huffman and Volkman on the negligence claims. The trial court entered a judgment against Huffman and Volkman, jointly and severally.[3] Huffman then filed her first appeal, which we dismissed

---

[3] After trial, the court's entry stated that the "jury found in favor of [the estate] and against both defendants and awarded damages in the amount of $500,000.00. Accordingly, the Court hereby enters judgment against defendants, jointly and severally, in the amount of $500,000.00." Although neither party raises the issue, the record indicates that the jury may have intended to render a verdict totaling $1,000,000 in damages. At trial, the jury was asked to answer an interrogatory that stated "What sum of money do you find to compensate for the death of Steven Hieneman?" The number "$700,000" appears as the answer to this interrogatory but was struck out and replaced with "$1,000,000." In the trial transcript, the court indicates that the jury's initial answer to this question was in fact $700,000. The jury also originally signed verdict forms stating 1.) "We, the Jury, do hereby find for the Plaintiff and against [Huffman] and we find that the total amount of compensatory damages is $200,000"; and 2.) "We, the Jury, do hereby find for the Plaintiff and against [Volkman] and we find that the total amount of compensatory damages is $500,000."

Counsel for the estate expressed concern that with joint and several liability, the amount of damages awarded against each defendant had to be the same. The trial court instructed the jury: "Okay. There's been a misunderstanding. When you find for the damages, they have to be in the same amount because they're jointly and severally liable. So whatever amount you come up with, it has to be found the same against Dr. Volkman and Denise Huffman. Okay? So what I'm going to ask you to do is basically just scratch out the figures you came up with and come up with figures that equal the same. Okay?" After the jury returned, the court indicated, "Now, it says 'We the jury find for the Plaintiff, against defendant, Paul Volkman, $500,000.00, and against Denise Huffman $500,000'. Any questions?" And no one responded. The jury did revise the verdict form for Huffman to indicate that "the total amount of compensatory damages is $500,000" and crossed out the previous response of $200,000. However, the trial court failed to mention that the jury also apparently altered the amount of $700,000 in the interrogatory to $1,000,000. Thus it appears that the jury may have been confused by the trial court's

for lack of a final appealable order due to the estate's unresolved prayer for punitive damages and State Farm's unresolved declaratory judgment action. *Eastley v. Volkman*, Scioto App. No. 08CA3223, 2009-Ohio-522.

**{¶13}** Subsequently, the estate dropped its request for punitive damages and State Farm filed motions for summary judgment on its declaratory judgment action. The estate also filed a motion for summary judgment, seeking a declaration that Huffman's negligence fell within the liability coverage of the business insurance policy State Farm issued. The trial court granted State Farm a summary judgment on its claims against Volkman but denied its motion concerning Huffman. Instead, the court granted the estate's motion for summary judgment. Then Huffman and State Farm filed separate appeals, which we consolidated.

## II. Assignments of Error

**{¶14}** Huffman assigns the following errors for our review:

I. THE JURY'S VERDICT AGAINST APPELLANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

II. THE TRIAL COURT ERRED BY FAILING TO INSTRUCT THE JURY REGARDING THE AFFIRMATIVE DEFENSE OF COMPARATIVE NEGLIGENCE.

III. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO DISMISS THE CASE BECAUSE APPELLEE FAILED TO ATTACH A CERTIFICATE OF MERIT TO BOTH THE ORIGINAL COMPLAINT AND THE AMENDED COMPLAINT.

IV. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTIONS TO CONTINUE THE TRIAL DATE UNTIL RESOLUTION OF HER CRIMINAL PRCEEDINGS.

**{¶15}** State Farm assigns the following errors for our review:

---

instruction and thought that it was awarding the estate $1,000,000 and instructing each defendant to pay $500,000 of that award.

I.  THE TRIAL COURT ERRED IN DENYING STATE FARM'S MOTION
FOR SUMMARY JUDGMENT AGAINST DENISE HUFFMAN.

II.  THE TRIAL COURT ERRED IN GRANTING [THE ESTATE'S]
MOTION FOR SUMMARY JUDGMENT AGAINST STATE FARM.

### III.  Manifest Weight of the Evidence

#### A.  Standard of Review

{¶16}  In her first assignment of error, Huffman contends that the jury's verdict was against the manifest weight of the evidence because she did not breach a duty of care or proximately cause Hieneman's death.  We must not reverse a decision as being against the manifest weight of the evidence if some competent, credible evidence supports it.  *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, at syllabus.  "This standard of review is highly deferential and even 'some' evidence is sufficient to sustain the judgment and prevent a reversal."  *Jones v. Jones*, Athens App. 07CA25, 2008-Ohio-2476, at ¶18, citing *Eddy v. Eddy*, Washington App. No. 01CA20, 2002-Ohio-4345, at ¶27.  Moreover, we presume the findings of the fact-finder are correct because it is best able to view the witnesses and observe their demeanor, gestures, and voice inflections and to use those observations to weigh the credibility of the testimony.  *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273.

#### B.  Negligence

{¶17}  "In order to recover on a negligence claim, a plaintiff must prove the existence of a duty of care, a breach of that duty, and that damages proximately resulted from the breach."  *Morgan v. Gracely*, Washington App. No. 05CA36, 2006-Ohio-2344, at ¶6, citing *Jeffers v. Olexo* (1989), 43 Ohio St.3d 140, 142, 539 N.E.2d

614. Whether the defendant had a duty is a question of law for the court. *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265. However, once a plaintiff establishes that the defendant had a duty, whether the defendant breached that duty is generally a question of fact for the jury. *Commerce & Industry Ins. Co. v. Toledo* (1989), 45 Ohio St.3d 96, 98, 543 N.E.2d 1188. Likewise, proximate cause ordinarily presents a question of fact for the jury. *Aldridge v. Reckart Equip. Co.*, Gallia App. No. 04CA17, 2006-Ohio-4964, at ¶79.

{¶18} A majority of this panel (Judges Harsha and Abele) conclude the jury's finding that Huffman breached a duty of care is against the manifest weight of the evidence. The estate did not pursue a theory of vicarious liability at trial, i.e. the estate did not argue that Huffman was secondarily liable for Volkman's negligence because of the nature of their relationship. Instead, the estate argued that Huffman was directly liable for Hieneman's death because she breached a duty of care in a manner entirely independent of Volkman's medical malpractice. In addressing Huffman's potential liability, the trial court instructed the jury, without objection, only on the basic elements of a negligence claim. Specifically, the court instructed the jury that "[e]very person is required to use ordinary care to avoid injuring another person," defined "ordinary care," and explained "proximate cause" and the factors the jury could consider in determining damages. This is a default standard, i.e. a standard applied when there is no other more specific standard addressed to the particular parties or their particular situation.

{¶19} However, the only theory of direct liability that the evidence in this case could feasibly support is a negligent supervision claim. If we presume the estate established by a preponderance of the evidence that Volkman's prescriptions

proximately caused Hieneman's death – a finding Huffman challenges – the only manner in which Huffman arguably did not exercise ordinary care was in failing to provide any oversight over Hieneman's treatment at the clinic.  Huffman admitted that she did not monitor Volkman's work.  And given her access to Hieneman's medical records, she may have had reason to question Volkman's decision to prescribe pain medications to a patient that appeared to have a history of abusing such medications.  If Huffman had supervised Volkman's work, perhaps he would not have prescribed Hieneman a lethal combination of pain killers.

**{¶20}**  But to succeed on a negligent supervision claim, the estate had to meet a more specific standard than the standard for a basic negligence claim.  The estate had to establish:  1). the existence of an employment relationship; 2.) the employee's incompetence; 3.) the employer's knowledge of the employee's incompetence; 4.) the employee's act or omission causing the plaintiff's injuries; and 5.) a causal link between the employer's negligence in supervising its employee and the plaintiff's injuries. *Whelan v. Vanderwist of Cincinnati, Inc.*, Geauga App. No. 2007-G-2769, 2008-Ohio-2135, at ¶48, citing *Lehrner v. Safeco Ins./Am. States Ins. Co.*, 171 Ohio App.3d 570, 2007-Ohio-795, 872 N.E.2d 295, at ¶42.  Initially, we question whether the estate could have proven that Volkman acted as an employee instead of as an independent contractor.  But more importantly, because the jury was not instructed on any of the specific elements of a negligent supervision claim, that theory cannot be a basis for upholding the jury's verdict.

**{¶21}**  We acknowledge that on appeal, the estate tries to classify Huffman's failure to supervise as a violation of a duty Huffman owed Hieneman based on his

status as an invitee at the clinic. However, we reject this characterization as the jury was not instructed on premise liability principles, e.g. the jury was not instructed on the definition of an invitee. Nor would premises liability principles seem to fit the plaintiff's theory of the case, i.e. Hieneman was not injured by any physical defects in the premises.

{¶22} The estate also attempts to couch Huffman's failure as negligence in making "administrative decisions" or providing "administrative oversight." Specifically, the estate argues that Huffman failed to provide "utilization reviews, quality assurance performance or quality standards, and internal review procedures." The estate also argues that she failed to provide any oversight over narcotic medication prescriptions even though she had looked at Hieneman's file before and arguably knew of his struggles with drug abuse. But regardless of how the estate frames its argument on appeal, these are simply examples of how Huffman could have, but did not, supervise Volkman. And because no evidence supports a finding that Huffman breached a duty of ordinary care separate from her failure to supervise Volkman, and because the jury was not instructed on the elements of a negligent supervision claim, we conclude the jury's verdict is against the manifest weight of the evidence.

{¶23} However, Section 3(B)(3), Article IV of the Ohio Constitution provides: "No judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." "Though this constitutional language is admirably straightforward," in *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, at paragraph four of the syllabus, the Supreme Court of Ohio "removed all opportunity to misconstrue Section 3(B)(3), Article

IV by stating, 'To reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required.'" *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, 874 N.E.2d 1198, at ¶2 (footnote omitted). Because one judge on this panel has "dissented" from the majority's determination that the jury's verdict is against the manifest weight of the evidence, the verdict withstands that challenge on the basis of the constitution of Ohio.

**{¶24}** The "dissent" apparently adopts a rule that provides before a party can raise a manifest weight of the evidence assignment of error on appeal, the party must preserve the issue by moving for a directed verdict, a new trial, and/or a JNOV. We are not aware of any case law supporting that position.[4] Nor do we believe it would be wise to erect such a hurdle for appellants and to create a significant additional workload for the trial courts.

**{¶25}** The "dissent" also questions whether appellate courts can even address a manifest weight of the evidence assignment of error in the context of a civil jury trial. For its contention that manifest weight challenges may not apply to civil jury trials, the dissent cites Painter & Pollis, Ohio Appellate Practice (2009-2010), Section 7:19. That treatise in turn cites *C.E. Morris Co.*, supra, which is a very brief opinion that deals solely with the standard of review for civil manifest weight of the evidence cases. *C.E. Morris Co.* does not address the scope or applicability of manifest weight arguments, i.e. whether they apply to civil jury trials, as well as civil bench trials.

---

[4] After reading the cases cited in the dissent, we remain unconvinced that neither caselaw nor procedural rule has erected such a hurdle.

**{¶26}** The "dissent" points to App.R. 12(C) to support its contention that we may be overstepping our bounds by even addressing the manifest weight issue. We do not agree that in civil matters, App.R. 12(C) limits a manifest weight challenge to cases tried to the court. That rule instructs appellate courts how to proceed "when [the] sole prejudicial error found is that [the] judgment of the trial court is against [the] manifest weight of the evidence[.]" App. R. 12(C) provides:

> In any civil action or proceeding which was tried to the trial court without the intervention of a jury, and when * * * a majority of the judges hearing the appeal find that the judgment * * * is against the manifest weight of the evidence and do not find any other prejudicial error * * * and do not find that the appellee is entitled to judgment * * * as a matter of law, the court of appeals shall reverse the judgment * * * and either weigh the evidence in the record * * * or remand the case to the trial court for further proceedings; provided further that a judgment shall be reversed only once on the manifest weight of the evidence.

App.R. 12(C) recognizes an appellate court's authority to reverse a court's judgment in a civil bench trial as being against the manifest weight of the evidence when only a majority of the panel members agree to do so. How can this acknowledgment of authority in the context of a civil bench trial be construed to preclude manifest weight challenges in civil jury trials? It does not expressly provide that in civil actions tried by the jury, there will be no manifest weight challenge. Nor could it. Section 3(B)(3), Article IV of the Ohio Constitution allows review of all weight of the evidence arguments. Again, that section reads: "No judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by concurrence of all three judges hearing the case." It does not limit weight of the evidence review to criminal cases, nor does it except civil jury trials from such review. It simply says that in jury cases (whether civil or criminal), all three judges must agree. App.R. 12(C) merely acknowledges in passing

that two judges may reverse on that basis in the context of a civil bench trial and directs the court how to proceed in that event.

**{¶27}** Finally, *Bryan-Wollman*, supra, involved a civil case that was tried to a jury. On review, the court of appeals reversed the judgment of the jury based upon the manifest weight of the evidence. The Supreme Court reversed the decision of the court of appeals because only two of the three judges on the panel agreed to reverse. In doing so, the Supreme Court found that the court of appeals violated Section 3(B)(3), Article IV of the Ohio Constitution. It did not find that manifest weight challenges do not apply to civil jury trials. Surely, if that were the rule, the court would have decided the case on that basis without further discussion.

**{¶28}** Thus, like a judgment in a criminal case, a civil judgment may be challenged as being against the manifest weight of the evidence regardless of whether it is the result of a bench trial or a jury trial. If a jury decided the case, then all three appellate judges must agree to reverse. But if that requirement is satisfied, we have the authority to reverse. See *Bryan-Wollman*. See, also, *Peoples v. Willoughby* (1990), 70 Ohio App.3d 848, 851, 592 N.E.2d 901. Nonetheless, under Section 3(B)(3), Article IV the jury's verdict in this case must survive.

IV. Comparative Negligence

**{¶29}** In her second assignment of error, Huffman contends that the court erred by refusing to give the jury an instruction on Hieneman's comparative negligence. The issue of whether a requested instruction is required presents a question of law we review de novo. *State v. Depew*, Ross App. No. 00CA2562, 2002-Ohio-6158, at ¶24. "Ordinarily requested instructions should be given if they are correct statements of the

law applicable to the facts in the case and reasonable minds might reach the conclusion sought by the instruction." *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 591, 575 N.E.2d 828, quoting Markus & Palmer, Trial Handbook for Ohio Lawyers (3 Ed.1991) 860, Section 36:2.

**{¶30}** Under Ohio law, if Hieneman's own negligence helped cause his death and his negligence was "not greater than" the combined tortious conduct of all other persons involved, the total compensatory damage award must be reduced by an amount that Is proportionately equal to the percentage of Hieneman's negligence.  R.C. 2315.33; R.C. 2315.35.  Huffman contends that "[c]learly seeking narcotic medication not for medical treatment but for addiction and refusing to follow doctor's orders regarding his medication could be considered negligent conduct" on Hieneman's part.

**{¶31}** Undoubtedly the estate claimed that Huffman and Volkman preyed on Hieneman's abuse of narcotic medications.  But even if we accept Huffman's premise that seeking narcotic medication to feed an addiction constitutes comparative negligence under these circumstances, neither side actually introduced any credible evidence that Hieneman was in fact addicted to narcotic medications at the time of his death and that this addiction proximately contributed to his death.  True, Hieneman's medical records demonstrate that past medical providers suspected he had an addiction problem.  In early 2003, one physician even stated that he felt Hieneman was motivated to have surgery "for the possibility of post-op pain meds."  But Hieneman died in 2005, and a claim that Hieneman had an undiagnosed addiction to pain medications that caused his death amounts to nothing more than speculation as no competent evidence supports those conclusions.

**{¶32}** Hieneman's mother testified to concerns that her son was "overmedicated" and that she tried to speak to Volkman and Huffman about Hieneman's treatment in August 2004. But she offered no specific testimony indicating that he was addicted to pain medications at the time of his death in 2005. There is no evidence Hieneman had a prescription for pain medication from February 24, 2004 until Februrary 22, 2005. The estate's expert testified that if the February 22, 2005 prescriptions were taken as prescribed, Hieneman would have been out of this medication for almost one month before his last appointment with Volkman on April 19, 2005. These treatment gaps contradict a claim of addiction.

**{¶33}** Moreover, Huffman points to no evidence that Hieneman "refused to follow" Volkman's orders regarding the medication prescribed in April 2005. In fact, the estate's expert testified that even if Hieneman took those medications as prescribed, they could have caused his death.

**{¶34}** Because no evidence exists that would allow reasonable minds to reach the conclusion that Hieneman negligently contributed to his own death, the court properly refused to instruct the jury on comparative negligence. Accordingly, we overrule Huffman's second assignment of error.

V. Affidavit of Merit

**{¶35}** In her third assignment of error, Huffman contends that the trial court erred when it denied her "motion to dismiss" the claims against her based on the estate's failure to include an affidavit of merit in the complaint or amended complaint. The version of Civ.R. 10(D)(2)(a) that was in effect when Eastley filed both complaints provided in part that "[e]xcept as provided in division (D)(2)(b) of this rule, a complaint

that contains a medical claim * * * as defined in section 2305.113 of the Revised Code, shall include an affidavit of merit relative to each defendant named in the complaint for whom expert testimony is necessary to establish liability."[5]

{¶36}   "A motion to dismiss for failure to state a claim upon which relief can be granted is procedural and tests the sufficiency of the complaint." *State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs.*, 65 Ohio St.3d 545, 548, 1992-Ohio-73, 605 N.E.2d 378. And Civ.R. 10(D)(2)'s heightened pleading requirement "goes directly to the sufficiency of the complaint[.]" *Fletcher v. Univ. Hospitals. of Cleveland*, 120 Ohio St.3d 167, 2008-Ohio-5379, 897 N.E.2d 147, at ¶13; see former Civ.R. 10(D)(2)(c) ("An affidavit of merit is required solely to establish the adequacy of the complaint and shall not otherwise be admissible as evidence or used for purposes of impeachment.")[6]   Thus, "[t]he proper response to the failure to file the affidavit required by Civ.R. 10(D)(2) is a motion to dismiss pursuant to Civ.R. 12(B)(6)." *Fletcher* at paragraph one of the syllabus.

{¶37}   Although the parties do not address the issue, Huffman filed an answer to the estate's amended complaint before she filed her "motion to dismiss."  Because a Civ.R. 12(B)(6) motion must be filed before a responsive pleading, the trial court should have construed the motion as a Civ.R. 12(C) motion for judgment on the pleadings. *Maynard v. Norfolk S. Ry.*, Scioto App. No. 08CA3267, 2009-Ohio-3143, at ¶11, citing *State ex. rel. Midwest Pride IV, Inc. v. Pontious*, 75 Ohio St.3d 565, 569, 1996-Ohio-459, 664 N.E.2d 931.  A Civ.R. 12(C) motion is essentially a belated Civ.R.12(B)(6) motion. *Dolan v. Glouster*, 173 Ohio App.3d 617, 2007-Ohio-6275, 879 N.E.2d 838, at ¶7, citing *State ex rel. Holloman v. Phillips*, 100 Ohio St.3d 70, 2003-Ohio-5063, 796

---

[5] The wording of this provision was slightly changed in a subsequent amendment effective July 1, 2007.
[6] This rule was in effect at the time the estate filed its complaint and amended complaint.  The current version of Civ.R. 10(D)(2)(d) contains a nearly identical provision.

N.E.2d 524, at ¶8, fn. 3.

**{¶38}** We review a court's denial of a motion for judgment on the pleadings de novo, giving no deference to the trial court's judgment. Id., citing *Fontbank, Inc. v. CompuServe, Inc.* (2000), 138 Ohio App.3d 801, 807, 742 N.E.2d 674. "Judgment on the pleadings is appropriate if, in construing all material allegations in the complaint in favor of the nonmoving party, together with all reasonable inferences to be drawn therefrom, the court finds, beyond doubt, that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." Id. A Civ.R. 12(C) motion "presents only questions of law, and determination of the motion * * * is restricted solely to the allegations in the pleadings." *Ruble v. Ream*, Washington App. 03CA14, 2003-Ohio-5969, at ¶8, quoting *Peterson v. Teodosio* (1973), 34 Ohio St.2d 161, 166, 297 N.E.2d 113.

**{¶39}** In its amended complaint, the estate alleged that Huffman "breached a duty she owed to [Hieneman] not to negligently cause him harm[,]" proximately resulting in his death. In other words, the estate alleged an ordinary negligence claim against Huffman.[7] Initially, we must address whether this claim meets the definition of a "medical claim" under R.C. 2305.113(E)(3), which provides:

> "Medical claim" means any claim that is asserted in any civil action against a physician, podiatrist, hospital, home, or residential facility, against any employee or agent of a physician, podiatrist, hospital, home, or residential facility, or against a licensed practical nurse, registered nurse, advanced practice nurse, physical therapist, physician assistant, emergency medical

---

[7] In its amended complaint, the estate alleged that Huffman and Volkman were "vicariously responsible for each other's conduct." In her "motion to dismiss," Huffman discussed the estate's apparent vicarious liability claim. However, in its response to the motion, the estate denied making such a claim: "Huffman suggests that her liability is vicarious for Volkman's negligence and, if the case fails against him, it fails against her. Huffman has not carefully read the amended complaint. The allegations against Huffman are separate and distinct from the allegations against Volkman." Moreover, the estate did not pursue a theory of vicarious liability at trial. Thus, we do not consider the impact of a claim for vicarious liability against Huffman on the need for an affidavit of merit in this case.

technician-basic, emergency medical technician-intermediate, or emergency medical technician-paramedic, and that arises out of the medical diagnosis, care, or treatment of any person. "Medical claim" includes the following:

(a) Derivative claims for relief that arise from the medical diagnosis, care, or treatment of a person;

(b) Claims that arise out of the medical diagnosis, care, or treatment of any person and to which either of the following applies:

(i) The claim results from acts or omissions in providing medical care.

(ii) The claim results from the hiring, training, supervision, retention, or termination of caregivers providing medical diagnosis, care, or treatment.

(c) Claims that arise out of the medical diagnosis, care, or treatment of any person and that are brought under section 3721.17 of the Revised Code.

**{¶40}** In *Estate of Stevic v. Bio-Medical Application of Ohio, Inc.*, 121 Ohio St.3d 488, 2009-Ohio-1525, 905 N.E.2d 635, at syllabus, the Supreme Court of Ohio held that a claim only qualifies as a "medical claim" under this definition if it "both arises out of the medical diagnosis, care, or treatment of any person and is asserted against one or more of the statutorily enumerated medical providers."  The estate did not allege that Huffman met the definition of one of the enumerated healthcare providers in this section.  And because the estate did not assert a "medical claim" against Huffman, it did not need an affidavit of merit in regards to her.

VI.  Motion to Stay Proceedings

**{¶41}** In her fourth assignment of error, Huffman contends that the trial court erred by denying her "motion to continue the trial date."  Initially, we must clarify the meaning of certain terms.  A "continuance" is "[t]he adjournment or postponement of a session, hearing, trial, or other proceeding to a subsequent day or time; usually on the

request or motion of one of the parties." Black's Law Dictionary, (Abridged 6 Ed.1991) 223. In contrast, a "stay" is "[a] stopping; the act of arresting a judicial proceeding by the order of a court." Id. at 983. A stay is "a suspension of the case * * *. It is a kind of injunction with which a court freezes its proceedings at a particular point. It can be used to stop the prosecution of the action altogether * * *." Id. It is apparent from the record that Huffman did not merely seek a change in the trial date but instead sought to halt all proceedings in the civil case against her until after the completion of proceedings in another jurisdiction. In other words, she sought a stay, not a continuance.

{¶42} Prior to the original trial date, Huffman filed a "motion to stay proceedings and to vacate trial date" in which she informed the court that she and Volkman had been indicted in federal court for offenses arising from the treatment of clinic patients. She sought to halt the civil proceedings, presumably until the completion of criminal proceedings against her in federal court. Huffman argued that she had to testify in the civil proceedings to properly defend herself but that such testimony would implicate her Fifth Amendment privilege against compulsory self-incrimination. The trial court issued a judgment entry in which it purported to grant Huffman's motion and stated that it "hereby stays the proceedings and vacates the July 30th jury trial date." But then the court set a new trial date for approximately seven months after the original date, indicating that despite the language used, the court actually viewed Huffman's motion as one for a continuance. Huffman did not complain about the misinterpretation of her motion or the fact that proceedings clearly did not halt after the court issued this entry. Before the second trial date, Huffman filed a second "motion to stay proceedings and to vacate trial date." She essentially repeated her argument from the first motion and

again sought to halt the civil proceedings.[8]  Huffman appeals from the court's denial of

this motion.

{¶43}  An appellate court reviews the denial of a motion to stay proceedings

under an abuse of discretion standard.  *State ex rel. Verhovec v. Mascio*, 81 Ohio St.3d

334, 336, 1998-Ohio-431, 691 N.E.2d 282 (per curiam).  The term "abuse of discretion"

implies that the court's attitude is unreasonable, unconscionable, or arbitrary.  *State v.*

*Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.  "When applying the abuse of

discretion standard, a reviewing court is not free to merely substitute its judgment for

that of the trial court."  *In re Jane Doe 1* (1991), 57 Ohio St.3d 135, 137-138, 566 N.E.2d

1181.

{¶44}  Huffman argues that given her Fifth Amendment privilege against self-

incrimination, the trial court should have granted a stay pending the resolution of the

criminal proceedings.  She complains that the court's refusal to grant her motion "forced

[her] to choose between testifying in the civil action and potentially incriminate [sic]

herself, or exercising her constitutional right to remain silent and risk a large civil verdict

against her."  And Huffman makes several complaints about how her choice to not

testify at trial hindered her defense.

{¶45}  "The Fifth Amendment permits a person not to answer questions in any

proceeding, civil or criminal, if the answers might incriminate that person in future

criminal proceedings."  *State ex rel. Verhovec* at 336, citing *Minnesota v. Murphy*

(1984), 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409.  However, in *Verhovec* the

Supreme Court of Ohio also explained:

---

[8] Even if we were to consider Huffman's motion as one for a continuance, rather than a stay, our decision
would be the same.

> [T]he Fifth Amendment protection against compulsory self-incriminating testimony does not extend to prohibit civil litigation while the possibility of criminal prosecution exists. *Tedeschi v. Grover* (1988), 39 Ohio App.3d 109, 111, 529 N.E.2d 480, 482; see, also, *Commonwealth Land Title Ins. Co. v. Davis* (Sept. 22, 1992), Franklin App. Nos. 91AP-1239 and 91AP-1240, unreported, 1992 WL 238897, and *Hauck v. Yockey* (Sept. 1, 1988), Franklin App. No. 87AP-795, unreported, 1988 WL 92437, following *Tedeschi.* "While the umbrella of Fifth Amendment guarantees is broad, the prohibition against compulsory testimony does not relieve a party from appearing or answering questions in a civil action." *Tedeschi,* 39 Ohio App.3d at 111, 529 N.E.2d at 482; see, also, *Murphy,* 465 U.S. at 427, 104 S.Ct. at 1142, 79 L.Ed.2d at 419 ("[T]he general obligation to appear and answer questions truthfully did not in itself convert Murphy's otherwise voluntary statements into compelled ones.").

Id.  Moreover, a stay is not justified by concern that a defendant's interest in not incriminating herself might preclude her from testifying in her own defense in the civil case:

> "[M]erely because a civil defendant may lose a suit which involves a substantial monetary stake does not, *ipso facto,* raise a claim of compulsion by the state" and does not violate any Fifth Amendment guarantee.  * * * In other words, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them * * *." *Baxter v. Palmigiano* (1976), 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810, 821.  See, also, 4 Rotunda & Nowak, Treatise on Constitutional Law (2 Ed.1992) 666, Section 23.23 ("[T]he protection against self-incrimination was not necessarily designed to protect witnesse[s] from every prejudicial effect resulting from their own testimony; the protection was designed to limit the coercive power of government."); but, cf., 5 Wright & Miller, Federal Practice and Procedure (1990) 515-516, Section 1280.

Id. at 336-337.

**{¶46}** Thus, we conclude that the trial court's refusal to stay the civil proceedings pending resolution of the criminal proceedings against Huffman was not unreasonable, arbitrary, or unconscionable.  We overrule Huffman's fourth assignment of error.

VII.  Declaratory Judgment Action

**{¶47}** In its first assignment of error, State Farm contends that the trial court erred in denying its summary judgment motion in the declaratory judgment action against Huffman. In its second assignment of error, State Farm argues that the court erred in granting the estate's summary judgment motion in that action. Under the insurance policy terms, State Farm agreed that it would "pay those sums that the insured becomes legally obligated to pay as damages because of **bodily injury** * * * to which this insurance applies." (Emphasis in original.) The policy defines "bodily injury" as "**bodily injury**, sickness or disease sustained by a person, including death resulting form the **bodily injury**, sickness or disease at any time[.]" (Emphasis in original). However, State Farm argues that it has no obligation to pay damages for Huffman's conduct in this case because various exclusions in the policy bar coverage.

A. Summary Judgment Standard

**{¶48}** When reviewing a trial court's decision on a motion for summary judgment, we conduct a de novo review. *Timberlake v. Sayre*, Scioto App. No. 09CA3269, 2009-Ohio-6005, at ¶17, citing *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 1996-Ohio-336, 671 N.E.2d 241. Accordingly, we must independently review the record to determine whether summary judgment was appropriate and do not defer to the trial court's decision. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153. Summary judgment is appropriate when the movant has established: (1) there is no genuine issue of material fact, (2) reasonable minds can come to but one conclusion, and that conclusion is adverse to the nonmoving party, with the evidence against that party being construed most strongly in its favor, and (3) the moving party is entitled to judgment as a matter of law. *Bostic v. Connor*

(1988), 37 Ohio St.3d 144, 146, 524 N.E.2d 881, citing *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 375 N.E.2d 46.  See Civ.R. 56(C).

{¶49}  The burden of showing that no genuine issue of material fact exists falls upon the party who moves for summary judgment.  *Dresher v. Burt*, 75 Ohio St.3d 280, 294, 1996-Ohio-107, 662 N.E.2d 264.  To meet its burden, the moving party must specifically refer to "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action" which affirmatively demonstrate that the non-moving party has no evidence to support the non-moving party's claims.  Civ.R. 56(C); See, also, *Hansen v. Wal-Mart Stores, Inc.*, Ross App. No. 07CA2990, 2008-Ohio-2477, at ¶8. Once the movant supports the motion with appropriate evidentiary materials, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Civ.R. 56(E).  "If the party does not so respond, summary judgment, if appropriate, shall be entered against the party."  Id.

### B.  The Policy's Professional Services Exclusion

{¶50}  "The interpretation of an insurance policy presents a question of law that an appellate court addresses de novo, without deference to the trial court."  *Crabtree v. 21st Century Ins. Co.*, 176 Ohio App.3d 507, 2008-Ohio-3335, 892 N.E.2d 925, at ¶9, citing *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108, 1995-Ohio-214, 652 N.E.2d 684.  In interpreting an insurance policy, the court's role "is to give effect to the intent of the parties to the agreement."  *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, at ¶11.  In doing so, "[w]e

examine the insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy. We look to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." Id. (Citations omitted).

{¶51} State Farm contends that the "professional services" exclusion in the policy bars coverage in this case. Business liability exclusion 10.d. states that "this insurance does not apply" to "**bodily injury** * * * due to rendering or failure to render any professional services or treatments. This includes but is not limited to: * * * medical, surgical, dental, x-ray, anesthetical or nursing services or treatments, but this exclusion only applies to an insured who is engaged in the business or occupation of providing any of these services or treatments[.]" (Emphasis in original).

{¶52} The estate argues that this exclusion does not apply because its ordinary negligence claim against Huffman is independent of its medical malpractice claim against Volkman. And the estate contends that its claim against Huffman is grounded in her commercial activities – not in any professional services she rendered. However, the exclusion makes no mention of the theory of liability an injured party pursues to recover damages. Rather, the plain language of the insurance policy provides that the exclusion's applicability hinges on 1.) what the injury is "due to" and 2.) the nature of the insured's business. See, generally, *Lehrner*, supra, at ¶33. "'Due to' is synonymous with 'caused by.'" *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.* (1998), 129

Ohio App.3d 45, 53, 716 N.E.2d 1201, citing Black's Law Dictionary (6 Ed.1990) 501.

Thus coverage is barred if 1.) the injury is caused by the rendering or failure to render

any professional services or treatments, e.g. medical services or treatment, and 2.) the

insured is engaged in the business or occupation of providing any of these services or

treatments.

{¶53} Here, there is no genuine issue of material fact regarding these issues.

The estate brought a medical malpractice claim against Volkman for Hieneman's death.

Volkman prescribed him Oxycodone, Valium, and Xanax.  An autopsy report showed

that Hieneman died from the acute combined effects of these three drugs the day after

Volkman prescribed them.  When a physician prescribes drugs, he undoubtedly has

rendered a medical service.  And a jury found that Volkman acted negligently and

proximately caused Hieneman's death.  Thus, it is clear that Hieneman's death was due

to or caused by the rendering of a professional service, i.e. a medical service.  Contrary

to the estate's assertion, the record does not support a finding that "Huffman's

negligence * * * constitutes an independent cause" of Hieneman's death.  In other

words, there is no evidence that some misconduct of Huffman would have proximately

resulted in Hieneman's death even if Volkman had not prescribed a lethal combination

of drugs.

{¶54} Finally, although she was not engaged in the occupation of medicine,

Huffman was indisputably engaged in the business of providing medical services to

patients at her clinic through doctors like Volkman.

{¶55} Under the unambiguous language of the policy, the "professional services"

exclusion applies in this case.  Because the exclusion barred coverage for Hieneman's

death, State Farm was entitled to judgment as a matter of law. Thus, the trial court erred in granting the estate's motion for summary judgment and in denying State Farm's motion. Accordingly, we sustain State Farm's first and second assignments of error. This decision renders moot State Farm's additional arguments that issues of fact remain as to whether the "willful and malicious" or "expected or intended" exclusions in the policy bar coverage.

## V. Conclusion

**{¶56}** We overrule Huffman's first, second, third and fourth assignments of error. We sustain State Farm's first and second assignments of error. Accordingly, we affirm the trial court's judgment in part, reverse it in part, and we remand this matter for further proceedings consistent with this opinion.

JUDGMENT AFFIRMED IN PART,
REVERSED IN PART,
AND CAUSE REMANDED.

Kline, J., dissenting, in part.

{¶57}  I concur in judgment and opinion except that I respectfully dissent with the part of the majority's opinion that addresses the manifest weight of the evidence issue because I believe that Huffman forfeited any consideration of the same.

{¶58}  Initially, I note that under Ohio law it is uncertain as to whether we may pass judgment on the manifest weight of the evidence in an appeal of a civil jury verdict. See Painter & Pollis, Ohio Appellate Practice (2009-2010 Ed.), Section 7:19 ("In a civil case, the authority to reverse on manifest-weight grounds is found in App.R. 12(C).  A manifest-weight challenge is available only in cases tried to the court without a jury[.]"). But, see, *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918 (considering a challenge to the manifest weight of the evidence of a civil jury verdict without reference to App.R. 12(C)).  We need not reach this issue because Huffman forfeited any consideration of the manifest weight of the evidence by failing to make any motion on that basis before the trial court.

{¶59}  Huffman, in her first assignment of error, contends that the verdict of the jury below is against the manifest weight of the evidence.  The concepts of the manifest weight of the evidence and the sufficiency of the evidence merge in a civil trial context. See *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, at ¶26 ("However, the standard in *C.E. Morris Co.* tends to merge the concepts of weight and sufficiency.  See *State v. Maple* (Apr. 2, 2002), 4th Dist. No. 01CA2605, 2002 WL 507530, fn. 1").  Unfortunately, the state of the law makes it somewhat unclear precisely what Huffman was required to do to preserve this issue.  The civil rules provide litigants with multiple opportunities to challenge the sufficiency or weight of the evidence both before trial,

Civ.R. 56 (summary judgment), during trial, Civ.R. 50(A) (directed verdict), and after trial, Civ.R. 50(B) (judgment notwithstanding the verdict) & Civ.R. 59(A)(6) (motion for a new trial). Here, we are concerned with events during and after trial.

**{¶60}** Ohio law clearly states that if a litigant fails to renew a motion for a directed verdict at the close of all the evidence the issue is waived. *Hinckley Roofing Inc. v. Motz*, Medina App. No. 04CA0055-M, 2005-Ohio-2404, at ¶11, citing *Chemical Bank of New York v. Neman* (1990), 52 Ohio St.3d 204, 206; *Helmick v. Republic-Franklin Ins. Co.* (1988), 39 Ohio St.3d 71, 72. Likewise, a party who fails to make motions for judgment notwithstanding the verdict or for a new trial forfeits those arguments on appeal. *Neal v. Blair* (Jun. 10, 1999), Lawrence App. No. 98CA37 (finding failure to make a motion under Civ.R. 59(A)(6) waived alleged error concerning the manifest weight of the evidence); see, also, *Bicudo v. Lexford Properties, Inc.*, 157 Ohio App.3d 509, 2004-Ohio-3202, at ¶39-41 (failure to raise an argument during the trial court's consideration of Civ.R. 50(B) motion for judgment notwithstanding the verdict waived the argument).

**{¶61}** In the present case, Huffman moved for a directed verdict at the close of the plaintiff's case, but she did not renew the motion at the close of all of the evidence. She also did not make any motion under Civ.R. 59(A)(6) or Civ.R. 50(B).

**{¶62}** For the present case, it does not matter whether Huffman's manifest weight of the evidence argument could be preserved only by moving for a new trial under Civ.R. 59(A)(6) (as *Neal* suggests) or if it could have been preserved by moving for a directed verdict under Civ.R. 50(A) or judgment notwithstanding the verdict under Civ.R. 50(B). Huffman failed to preserve any arguments under any of these procedural

vehicles.  Therefore, I would find that she has forfeited all but plain error for any argument based on the manifest weight of the evidence.

{¶63}  "The plain error doctrine is applicable in civil cases only where the error 'seriously affects the basic fairness, integrity, or public reputation of the judicial process.'"  *Rocky v. Rockey*, Highland App. No. 08CA4, 2008-Ohio-6525, at ¶10, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122-23, 1997-Ohio-401.  I do not find this such an extraordinary case as to seriously affect the basic fairness, integrity, or public reputation of the judicial process.

{¶64}  Accordingly, I respectfully dissent, in part.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED IN PART AND REVERSED IN PART and that the CAUSE IS REMANDED.  Appellant and Appellee shall split the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.  Exceptions.

Harsha, J. & Abele, J.:  Concur in Judgment and Opinion.
Kline, J.:  Concurs in Judgment and Opinion, in part, and Dissents, in part, with attached opinion, as to Assignment of Error I.

For the Court

_____
William H. Harsha, Judge

**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**